Moncure, P.
This is a writ of error to a judgment of the Corporation court of the city of Alexandria, whereby the plaintiff in error was convicted of murder in the second degree. The accused having been indicted for the said murder in the said court, on the 12th of July, 1870, on the next day moved the court to remove the cause to the Circuit court of the said city for trial, which motion was sustained, and the cause was ordered to be certified to the said Circuit court. Afterwards, on the same day, and before the signing of the minutes, the said order was rescinded; the accused, by his counsel, excepting to the order of rescisión, as is therein stated; though no hill of exceptions to that effect appears in the record. It does not appear that the accused was personally present when the order of rescisión was made, hut it may he fairly inferred that he was not. On the next day, to wit: the-14th of July, 1870, the accused being personally present, again moved the court to remove the cause to the said Circuit court for trial, which motion was then overruled; and a bill of exceptions to the said ruling of the: *862 court was tendered by the accused and signed and sealed by the court. The cause was then continued to the next quarterly term of the court, on the motion of aceuse^-
At the next quarterly term, to wit: on the 10th of October, 1870, the accused presented several affidavits of himself and others, tending to show that, by reason of the prejudice against him, he could not get a fair trial in the said city, and moved the court for a change of venue; which motion was overruled. "Whereupon he moved for and obtained a continuance of the cause until the November term, 1870, of the court. The affidavits on which the said motion for a change of venue was founded, are copied in the record, but no further notice need be taken of them, as no exception was taken to the opinion of the court overruling that motion. At November term, the cause was again continued on the motion of the accused. At December term, 1870, the accused, being arraigned on the said indictment, refused to plead thereto, when the plea of not guilty was entered for him by order of the court, according to law, and the trial proceeded.
In the progress of the trial, two instructions were asked for by the accused; but the court refused to give them, and gave several instructions of its own. The accused excepted to the action of the court in refusing and giving instructions as aforesaid, and the facts proved on the trial are set out in the bill of exceptions. The jury found the accused guilty of murder in the second degree, and fixed the term of his imprisonment in the penitentiary at eleven years. The accused then moved for a new trial, and in arrest of judgment; but both motions were overruled by the court. No exception was taken, however, to those rulings of the court, and they need not he 'noticed again. The court having rendered judgment according to the verdict, this *863 writ of error brings up that judgment for review before tbis court.
Tbe first error assigned is, that tbe corporation court ■ erred in refusing to allow the case to be removed to tbe Circuit court of tbe city of Alexandria.
Undoubtedly, tbis would bave been error if tbe Code, chap. 208, § 1, as amended by tbe act to revise and amend tbe criminal procedure, passed April 27, 1867, Acts of Assembly 1866-67, p. 931, bad remained unchanged when the motion was made for tbe removal of tbe case as aforesaid. By that section, as so amended, it was declared that “trials for felony shall be in a County or Corporation court, and may be at any term thereof; except that a person to be tried for rape,” &c. (naming certain other specific offences, including murder), “may, upon bis arraignment in tbe County or Corporation court, demand to be tried in tbe Circuit court having jurisdiction of tbe said county or corporation,” &e. But that provision of tbe Code was changed in regard to Corporation courts by tbe act approved April 2, 1870, entitled “an act to prescribe and define tbe jurisdiction of tbe County and Corporation courts of tbe Commonwealth, and tbe times and places of bolding tbe same.” Acts of Assembly 1869— 70, p. 36. Indeed, tbe change may be said to bave been made by tbe Constitution, article 6, sec. 14, which provides that “for each city or town in tbe State, containing a population of five thousand, shall be elected on tbe joint vote of tbe two bouses of tbe general assembly, one city judge, who shall bold a Corporation ■or Hustings court of said city or town as often and as many days in each month as may be prescribed by law, with similar jurisdiction which may be given by law to tbe Circuit courts of tbis State,” &e. Tbe sixth section of the act of April 2, 1870, aforesaid, in conformity with tbe provision of the constitution just referred to, enacts that “ for each town or city of tbe *864 State containing a population of five thousand, there stall be a court called a Corporation court, to be held by a judge with like qualifications and elected in the same manner as judges of the County court.” And the 7th section enacts, that ‘"‘the several Corporation courts of this State shall, within their respective limits* have the same jurisdiction as the Circuit courts, and the same jurisdiction as County courts, over all offences committed within their limits,” &c. The effect of these provisions of the constitution and act aforesaid, is to take away from persons accused of certain felonies in Corporation courts, the right they would otherwise have, to demand to be tried in the Circuit court having jurisdiction of the said corporation. That this is so, appears conclusively from the fact that the 4th section of the act aforesaid prescribing the criminal jurisdiction of County courts, expressly authorizes a person about to be tried for arson, or any felony for which he may be punished with death, upon his arraignment in the County court, to demand to be tried in the Circuit court of the county. Whereas the 7th section of the same act, prescribing the jurisdiction of the Corporation courts, gives no such authority; but on the contrary, the 8th section declares, that “all persons who have heretofore elected to be tried in the Circuit court, shall be tried in said court, anything in this act to the contrary notwithstanding: ” thus showing that it was not intended to give any such right of election thereafter to a person charged with an offence in a Corporation court.
I therefore think the Corporation court did not err in refusing to allow the case to be removed to the Circuit court.
An objection is taken in the brief of the plaintiff’s counsel, though not assigned as error in the petition, that the order of rescisión aforesaid was not made in the personal presence of the accused. Sperry’s case, 9 *865 Leigh 623; Hooker’s case, 13 Gratt. 763. The Code, ch. 208, § 3, provides, that “ any person tried for felony shall be personally present during the trial.” The said order of rescisión was made before the commencement of the trial. The accused was not in fact arraigned until after that order was made, as the record shows, though it erroneously states that he was arraigned when the rescinded order was made. His personal presence was, therefore, not necessary when the order of rescisión was made. He was present by his counsel, who excepted, that is objected, to the order. Ho bill of exceptions on the subject was signed. The order of removal was void, the Circuit court having no jurisdiction of the case. On the day after the recision of that order, the accused, being personally present in court, made another motion for the removal of the cause, which was overruled, and a bill of exceptions was tendered and signed. This would have cured the irregularity, if there had been any, in making the order of rescisión without his personal presence. I therefore' think this objection is untenable. A like objection was taken in the brief, though not in the petition, that the case was continued at Hovember term, 1870, on the motion of the counsel of the accused, when the latter was not personally present. This was before the arraignment, and the objection is, therefore, untenable, for reasons already given.
The next assignment of error, and that which is mainly relied on, is the refusal of the court to give the instructions asked for by the accused, and the giving of others in their stead.
The facts proved on the trial, and on which the said instructions were founded, are in substance as follows: On the evening of the 4th of July, 1870, Boswell (the accused), being drunk and staggering, came up King street (in Alexandria) to West street, and upset a bai’rel ixx front of a store on King street, as he went by; *866 that he turned down "West street, going in a northerly direction, and keeping on th? east side of the latter street; that, as he walked along, he exclaimed, in violent tones, “ I will blow his damn brains out; will kill the damn little sons of bitches;” that there was at the time two little negro girls passing along the west side of West street, going in a southerly direction and towards King street, a number of ducks in the street about ten feet from him, and still further on, a cart, both the ducks and the cart being between prisoner and the other side of the street, though it did not appear that the cart was between prisoner and the little girls; that, when about midway of the square, Boswell picked up a brick, and, casting it across the street, struck one of the little girls on the right side of the head, above the ear; that the girl fell in a dying condition, and expired at 10 o’clock in the night of that day; that the girl so struck was named Martha Brench, and was about six years and nine months old ; that, after throwing the brick, Boswell turned and walked to the corner of King and West streets, took off: his coat or jacket, put it on the curbstone, and sat down; while there he was told by a witñess not to go away, and replied, “If I have done anything wrong, you can take out your penknife and cut my throat. I give myself up—If I killed the child, I did not intend to do it;” that Boswell had been grossly intoxicated for a week, except on the day preceding the day on which the alleged crime was committed, and had no previous acquaintance with the deceased; that Boswell, the day before the killing of the child, when asked by Thos. Huntington why he did not reform and behave himself, said he wanted to die, but did not know why; that, one day in the latter part of June, 1870, he threw himself into a small stream near Alexandria, called Hooff’s run, at a place where the water is about eight inches deep, and Lucien Hooff and an *867 other man, who was passing by, found him lying on his face in the water, out of which they pulled him, •and laid him on the grass; if he had been left in the ■ water, he would have drowned; that they then went away, and Hooff, on looking back, saw Boswell again throw himself into the water, and Hooff and a man named Cunningham pulled him out, and left him lying ■on the bank in an insensible condition; he would have been drowned in two minutes, had he not been rescued; that, in June, 1870, some two weeks prior to the killing of the child, Boswell came to the depot of the Orange, Alexandria and Manassas railroad, excessively drunk, and staggering and throwing himself .about, and threw himself across the cow-catcher of an •engine in motion, which dragged him some distance; that the engineer stopped, and two men took him off the cow-catcher, and threw him on a pile of manure ; that about an hour afterwards, as the southern-bound train was leaving the depot, Boswell was discovered lying on one or both rails of the track, near the culvert, a short distance from the depot; that the engineer stopped the train, and the same two men dragged him off the track, and threw him down the embankment; that each month, about the change of the moon, John Boswell, the prisoner’s younger brother, would go home, refuse to work, and, when approached with directions to go to work, would be listless, indifferent, and seem not to understand.
After the evidence was heard by the jury, the accused, by counsel, moved the court to give them the following instructions:
1st. If the jury shall believe, from the evidence, that the prisoner was drunk at the time of the killing, in the indictment mentioned, and that such drunkenness was brought on by sensual or social gratification, with no criminal intent, then they are justified in finding a *868 verdict of voluntary manslaughter; provided they also-believe, from the evidence, that there was no malice.
2d. If the jury believe, from the evidence, that .the-drunkenness aforesaid was the result of long-continue¿l and habitual drinking, without any purpose to commit crime; and that the drunkenness produced insanity, whether temporary or permanent, and that the prisoner was in such condition at the time of the killing aforesaid, then the jury may find a verdict of not guilty;' and further, that where the jury, from the evidence^, should entertain a rational doubt on the question of' insanity, they should find in favor of insanity; or if they should entertain, from the evidence, reasonable doubt of any material portion of the charge, the prisoner” shall have the benefit of that doubt.
And the court refused to give the said instructions,, and gave the following to the jury:
1st. That every man is presumed to be sane, and to possess a sufficient degree of reason -to be responsible for his crimes, until the contrary'is proved to their satisfaction; that if, from the evidence, the jury believe that, at the time of throwing the brick, the blow from which caused the death of the deceased, the prisoner was laboring under such a defect of reason from disease of the mind (remotely produced by previous hab? its of gross intemperance), as not to know the nature and possible consequences of his act, or if he did know, then that he did not know he was doing what was wrong, they will find the prisoner not guilty.
2d. That if the jury shall believe beyond reasonable doubt, from the evidence, that the prisoner threw the brick at the deceased-without provocation and through reckless wickedness of heart, but that, at the time of doing so, his condition, from intoxication or other causes, was such as to. render him incapable of doing a willful, deliberate and premeditated act, then they will find the prisoner guilty of murder in the second degree.
*869 3d. That if the jury believe, from the evidence, be,yond reasonable doubt, that the prisoner, though intoxicated at the time of throwing the brick which caused the death of the deceased, was capable of knowing the nature and consequence of his act, and if he did know, then that he knew he was doing wrong, and that, so knowing, he threw the brick at the deceased with the willful, deliberate and premeditated purpose of killing her, then they will find the prisoner guilty of murder in the first degree.
4th. That if the jury believe, from the evidence, that the prisoner, at the time of throwing the brick at the deceased, was in such a condition as to render him incapable of a willful, deliberate and premeditated purpose, and that he did not so throw it out of any reckless wickedness of heart or purpose, then they will find the prisoner guilty of voluntary manslaughter.
5th. If the jury should acquit the prisoner, by reason of their believing him insane, that they will so state in their verdict.
The law in regard to the extent to which intoxication affects responsibility for crime, seems to be now well settled; and the only difficulty is in the application of the law to the facts of a particular case.
In 1 Hale’s P. C. page 32, he says: “ The third sort of madness is that which is dementia affedata; namely, drunkenness. This vice doth, deprive a man of his reason, and puts many men into a perfect, but temporary frenzy; but by the laws of England, such a person shall have no privilege by his voluntarily contracted madness, but shall have the same judgment as if he were in his right senses.” See also 1 Russell on Crimes, p. 7; and 4 Bl. Com. 26. Blackstone says, in regard to the excuse of drunkenness; “The law of England, considering how easy it is to counterfeit this excuse, and how weak an excuse it is, though real, 'will not suffer any man thus to privilege one crime by *870 another.” In Rex v. Thomas, 7 Car. & Payne R. 817, 820, Parke, B. said to the jury: “I must also tell you, that if a man makes himself voluntarily drunk, it is no excuse for any crime he may commit whilst he is so; he must take the' consequences of his own voluntary act, or most crimes would go unpunished.” And in John Burrow’s case, 1 Crim. C. C. 238, Holroyd, J. told the jury: “Drunkenness is not insanity, nor does it answer to what is termed an unsound mind, unless the derangement which it causes becomes fixed and continued .by the drunkenness being habitual, and thereby; rendering the party incapable of distinguishing between right and wrong.”
. The American cases establish the same doctrine with the English on this subject. In Pirtle v. The State, 9 Humph. R. 663, the court, in explaining the decision in Swan v. The State, 4 Humph. R. 136, say: “This reasoning is alone applicable to cases of murder under our act of 1829, ch. 23, which provides ‘that all 'murder committed by means of poison, lying in wait, or any other kind of wilful, deliberate, malicious and premeditated killing,’ &c. ‘ shall be deemed murder in the first degree, and all other kinds of murder shall be deemed murder in the second degree.’ How, this is drawing a distinction unknown to the common law, solely with a view to the punishment; murder in the first degree being punishable with death, and murder in the second degree by confinement in the penitentiary. In order to inflict the punishment of death, the murder must have been committed wilfully, deliberately, maliciously and premeditatedly. This state of mind is conclusively proven when the death has been inflicted by poison or by lying in wait for that purpose; but if neither of these concomitants attended the killing, then the state of mind necessary to constitute murder in the first degree, by the wilfulness, the deliberation, the maliciousness, the premeditation, if it *871 exist, must be otherwise proven.” In all such cases, whatever fact is calculated to cast light upon the mental status of the offender, is legitimate proof; and among others the fact that he was at the time drunk; not that this will excuse or mitigate the offence if it were done wilfully, deliberately, maliciously and premeditatedly; (which it might well be, though the perpetrator was drunk at the time), but to shew that the killing did not spring from a premeditated purpose.” “ This distinction can never exist except between murder in the first degree and murder in the second degree under our statute.” “As between the two offences of murder in the second _ degree and manslaughter, the drunkenness of the offender can form no legitimate matter of enquiry; the killing being voluntary, the offence is necessarily murder in the second degree, unless the provocation were of such a character as would at common law constitute it manslaughter, and for which latter offence a drunken man is equally responsible as a sober one.” I have quoted thus largely from this case, because it lays down the law very correctly, and is specially applicable in this State, in which there is a law very much, if not precisely, like that of Tennessee, distinguishing between murder in the first and second degree. The most material cases, English and American, bearing upon this whole subject, are collected in a note to the case of United States v. Drew, 5 Mason R. 28, in 1 Lead. Crim. Ca. pp. 113-124. See also 1 Wharton’s Am. C. L. §§ 32-44.
With this general view of the law on the subject, I will now take some notice of the instructions in detail; and first, of those asked for by the accused.
The first instruction asked for was properly refused. It states a case of murder, and asks the court to instruct the jury that it was a case of voluntary manslaughter. The words at the conclusion, “provided *872 they also believe, from the evidence, that there was no malice,” do not alter the case. The law implies malice, from the facts stated in the former part of the instruction. The word “malice,” in the proviso, can mean only express malice, which is unnecessary to constitute murder; malice, express or implied, being sufficient. Or if it mean malice generally, then the proviso is in conflict with the body of the instruction, which is therefore faulty, and it was proper on that ground, if no other, to refuse to give it.
The second instruction asked for was also properly-refused. Drunkenness is no excuse for crime, although such drunkenness may be “the result of long-continued and habitual drinking, without any purpose to commit crime,” and may have produced temporary insanity, during the existence of which the criminal act is committed. In other words, a person, whether he be an habitual drinker or not, cannot, voluntarily, make himself so drunk as to become, on that account, irresponsible for his conduct during such drunkenness. He may be perfectly unconscious of what he does, and yet he is responsible. He may be incapable of express malice, but the law implies malice in such a case, from the nature of the instrument used, the absence of provocation, and other circumstances under which the act is done. Public policy and public safety imperatively require that such should be the law. If permanent insanity be produced by habitual drunkenness, then, like any other insanity, it excuses an act 'which would be otherwise criminal. The law looks at proximate, and not remote, causes in this matter. Finding the accused to be permanently insane, it enquires not into the cause of his insanity. In the leading case of the United States v. Drew, before referred to, which was a case of murder, Mr. Justice Story held the accused not responsible, the act having been done under an insane delusion, produced by a disease, brought on by intern *873 perance, called delirium tremens. “In general,” said the judge, “insanity is an excuse for the commission of every crime, because the party has not the posses- - sion of that reason which includes responsibility. An exception is, when the crime is committed by a paz-ty while in a fit of intoxication, the law not permitting a man to avail himself of the excuse of his own gross vice and misconduct to shelter himself from the legal consequences of such crime. But the crime must take place and be the immediate result of the fit of intoxicartion, and lohile it lasts; and not, as in this case, a remote consequence, superinduced by the antecedent exhaustion of the party, arising from gross and habitual drunkenness.” Had the crime been committed while Brew was in a fit of intoxication, he would have been liable to be convicted of murder. As he was not then intoxicated, but merely insane from an abstinence from liquor, he cannot be pronounced guilty of the offence. The law looks to the immediate, not to the remote, cause; to the actual state of the party, and not to the causes which remotely produced it.” That is the first case in which it has been held that an act otherwise criminal, done by a person laboring under the disease of delirium tremens, might be excusable on the ground of insanity. "Without meaning to question the authority of that case, and conceding it to be good law, as it may be, still it does not apply to this case; for it expressly admits that “had the crime been committed while Brew was in a fit of intoxication, he would have been liable to be convicted of murder-.” In this case, it is not pretended that the accused had delirium tremens, or anything like it, when he committed the act, and the instruction asked for expressly admits that the act was done by the accused while he was drunk. So that, according to the law, as it was admitted to be in the case of the United States v. Drew, such drunkenness is no excuse. This is a sufficient *874 reason for refusing to give the second instruction asked for. The latter part of that instruction embraces another proposition, which will be noticed presently.
instructions which were given by the court, the first, I think, is unexceptionable. To the greater part, and all but the first two or three lines, no objection has been, or properly can, be taken. To the first part of it, which is in these words: “ That every mail is presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary is proved to their • satisfaction,” the accused objects. Of course he does not, and cannot, object to so much even of that part as says “ that every man is presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes.” He only objects to the concluding words of the sentence, “ until the contrary is proved to their satisfaction.” Indeed, the objection only goes to the three concluding words, “ to their satisfactionwhich he seems to think is an excessive measure of the proof required by law to repel the presumption of sanity. He seems to think (and that is the thought which is embodied in the latter part of the second instruction asked for) that all the proof required by law, to repel the said presumption, was only so much as would raise a rational doubt of his sanity at the time of committing the act charged against him. How, I think this is not law; and that the law is correctly expounded in the first instruction given by the court. There are, certainly, several American cases which seem to sustain the view of the accused, and are referred to - by his counsel. But I think the decided weight of authority, English and American, is the other way, as' the «cases referred to by the attorney-general will show. In 1 Wharton’s Am. Cr. L. § 711, the writer says: “ At common law, the preponderance of authority is, that if the defence be insanity, it must be substantially *875 proved as an independent fact;” and for this he cites Rex v. Stokes, 3 C. & K. 138; Rex v. Taylor, 4 Cox C. C. 155; State v. Bringer, 5 Alab. R. 244; State v. Starke, 1 Strobh. R. 479; State v. Huting, 6 Bennett’s R. 474; State v. Starling, 6 Jones’ N. C. R. 471; State v. Spencer, 1 Zabr. R. 202; State v. Bonfant, 3 Minne. R. 123; State v. Brandon, 8 Jones’ N. C. R. 463; People v. Myers, 20 Calif. R. 518. “ On the other hand,” he proceeds, “ it has been ruled in Massachusetts, in 1856, that the defence is made out if the prisoner satisfied the jury, by a preponderance of evidence, that he is insane.” And for this he cites Com. v. Eddy, 7 Gray R. 583; Com. v. Sogers, 7 Metc. R. 500. “And in other courts it has been held, that in this, as in all other constituents of guilt, the burden is on the prosecution.” And for this he cites People v. McCann, 2 E. P. Smith (16 N. Y.) 58; Ogleton v. State, 28 Alab. R. 692; U. S. v. McClure, 7 Law R. n. s. 439; State v. Bartlett, 43 N. Hamp. R. 224; Polk v. State, 19 Ind. R. 170; Hopps v. State, 31 Ill. R. 385; see also Chase v. The People, 40 Ill. R. 358, in which Hopps v. The State is explained. Now, here we have a reference to nearly all the authorities on either side bearing upon this question. And I think the fair result of them is to show that insanity, when it is relied on as a defence to a charge of crime, must be proved to the satisfaction of the jury, to entitle the accused to be acquitted on that ground; though such proof may be furnished by evidence introduced by the Commonwealth to sustain the charge, as well as by evidence introduced by the accused to sustain the defence. This result consists with reason and principle. The law presumes every person sane till the contrary is proved. The Commonwealth having proved the corpus delicti, and that the act was done -by the accused, has made out her case. If he relies on the defence of insanity, he must prove it to the satisfaction of the jury. E, upon the whole evidence, *876 they believed he was insane when he committed the act, they will acquit him on that ground. But not upon any fanciful ground, that, though they believe he was then sane, yet, as there may be a rational doubt of such sanity, he is therefore entitled to an acquittal. Insanity is easily feigned, and hard to be- disproved, and public safety requires that it should not be established by less than satisfactory evidence. Some of the cases have gone so far as to place the presumption of sanity on the same ground with the presumption of innocence, and to require the same degree of evidence to repel it. But I do-not think it is necessary or proper to go to that extent. See, also, Roscoe’s Or. Ev., library edition, pp. 905-909; opinions of the judges on questions propounded by the House of Lords, 47 Eng. C. L. R. p. 129; State v. Willis, 63 N. C. R. 26; Graham v. Commonwealth, 16 B. Mon. R. 587; Commonwealth v. York, 9 Metc. R. 93.
As to the second instruction given by the court, it seems to be free from any just ground of objection, except that I think the words “ other causes” ought to have been omitted. If a person be incapable from other causes than intoxication, of doing a willful, deliberate and premeditated act, he would seem to be incapable of murder in the second degree, or any other crime. To be sure, the words “ through reckless wickedness of heart,” in the former part of the instruction, imply malice; but it is difficult to see how a person guilty of doing an act through reckless wickedness of heart, could, at the same time, be in such condition from other causes than intoxication, as to render him incapable of doing a willful, deliberate and premeditated act. There is, therefore, an apparent conflict between the different parts of the instruction, and, at all ■events, it was calculated to mislead the jury.
The third instruction given by the court is unobjectionable and unobjected to.
*877 The fourth instruction given hy the court is objectionable on the ground taken by the counsel of the accused, that it assumes the fact that the accused threw the brick at the deceased, which ought to have been referred to the jury. The instruction ought to have stated the fact hypothetically, thiis: “That if the jury believe, frormthe evidence, that the prisoner threw a brick at the deceased, which caused her death, and that, at the time of so doing, he was in such a condition of drunkenness 'as to render him incapable of a willful, deliberate and premeditated purpose, and that he did not s© throw it out of any reckless wickedness of heart or purpose, then they will find the prisoner guilty of voluntary manslaughter.”
Whether the accused threw the brick at the deceased or not, was a fair question of controversy before the jury upon the evidence. He might have thrown it at her, or he might have thrown it at the ducks in the street, or he might have thrown it at random. In either case, he did an unlawful act, likely to do mischief, considering the time and place and circumstances under which it was done, and he was therefore responsible for the consequences of the act as a crime. But the degree of such crime depended upon the intention with which the brick was thrown. Such intention was, therefore, a material fact to be determined by the jury, and the court invaded their province in assuming it.
The fifth instruction given’ by the court is, of course, unobj ectionable.
The result of my opinion is, that there is no other error in the judgment than those in the second and fourth instructions given by the court as aforesaid; but for those errors the said judgment ought to be reversed, the verdict set aside, and the cause remanded for a new trial to be had therein.
*878 Joynes, J., concurred in the opinion of Moncure, P., except as to what is said therein upon the burden of proof oh the question of insanity. He was of opinion that the burden was on the Commonwealth to prove the sanity of the prisoner.
The other judges concurred in the opinion of Mon-cure, P.
Judgment reversed.